Michael D. Corey
SANDBERG, WUESTENFELD & COREY
701 W. 8th Avenue, Suite 1100
Anchorage, AK  99501
Phone:  (907)276-6363
Fax:  (907)276-3528
mdc1@aol.com

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| DEBBIE and PAUL K. GUNDERSON, husband and wife, <br><br>    Plaintiffs, <br><br>    v. <br><br>CITY OF SAND POINT, a Municipal Corporation, <br><br>    Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.:3:06-cv-00157 (TMB) <br> ) |

CITY OF SAND POINT'S MOTION FOR SUMMARY JUDGMENT

I.   Factual Background.

On June 5, 2004 at approximately 2:48 a.m., the Sand Point Police Department received a telephone call from an unknown woman, advising that Paul Gunderson, III, was driving his grey colored truck, while intoxicated. (Exhibit A).  At approximately 4:12 a.m., Police Chief Joseph Lee Shoemaker observed the suspect vehicle traveling approximately 45 m.p.h. in a 25 m.p.h. speed zone on Sand Point Avenue, Nagai Avenue and Red Cove Road. (Exhibit A).  The driver of the truck failed to stop for Chief

Shoemaker's police emergency lights. (Exhibit A). While being pursued, the vehicle continued to speed and failed to stop for the stop sign at the intersection of Red Cove Road and Kelly Avenue. (Exhibit A).

Chief Shoemaker saw a person he understood to be Paul K. Gunderson, III, exit the truck from the driver's seat and enter the Gunderson residence located at 445 Red Cove Road. (Exhibit A). Chief Shoemaker parked his police car behind Gunderson's truck, exited his car and felt heat coming from the engine compartment of the truck. (Exhibit A). Chief Shoemaker observed that there were no keys in the truck's ignition and that there was an empty beer bottle and beer can in the bed of the truck. (Exhibit A). Chief Shoemaker further witnessed a fresh set of wet footprints leading from the porch area through a portion of the residence under construction, not sealed from the outside and continue into the doorway of the house. (Exhibit A).

Chief Shoemaker knocked and announced his presence numerous times in an attempt to have Gunderson, III, answer the door. (Exhibit A). Following these initial failed attempts to have Gunderson, III, to answer the door, Chief Shoemaker asked the police dispatcher to call the residence in an effort to get someone to respond to his presence. (Exhibit A). No one inside the Gunderson home would answer the telephone. (Exhibit A).. Chief Shoemaker again knocked and announced his presence and was

thereby successful in getting Paul K. Gunderson, II, to answer the door. (Exhibit A).

Chief Shoemaker explained his presence to Gunderson, II, and asked to speak with Gunderson, III. (Exhibit A). Gunderson, II, closed the front door and walked back into the house, later returning to inform Chief Shoemaker that Gunderson, III, was asleep, was not drinking and did not want to speak with the police. (Exhibit A). Chief Shoemaker continued to express his desire to speak with Gunderson, III. (Exhibit A).

At this point Ms. Debbie Gunderson came to the door expressing to Chief Shoemaker that it was too late at night and that Chief Shoemaker should return the following day to speak to Gunderson, III. (Exhibit A). Chief Shoemaker explained to Ms. Gunderson that he had seen Gunderson, III, driving his truck while believed to be intoxicated. (Exhibit A). Chief Shoemaker also explained to Ms. Gunderson the litany of infractions committed by Gunderson, III, and witnessed by Chief Shoemaker. (Exhibit A). Chief Shoemaker advised Ms. Gunderson that these offenses yielded a characterization of Gunderson, III's conduct as alluding a felony offense. (Exhibit A). Chief Shoemaker further advised Ms. Gunderson that based on Gunderson, III's actions as witnessed by Chief Shoemaker, Chief Shoemaker was permitted to either enter the Gunderson home or to get an arrest warrant for Gunderson, III. (Exhibit A). Ms. Gunderson

nevertheless refused to call Gunderson, III, to the door. (Exhibit A).

As Chief Shoemaker and Ms. Gunderson were speaking, Chief Shoemaker observed Gunderson, III, walking within the home. (Exhibit A). Chief Shoemaker was able to observe Gunderson, III, sufficiently well to identify a flush red-colored face and red watery eyes. (Exhibit A). On five separate occasions, Chief Shoemaker requested Gunderson, III, to approach him. (Exhibit A). Gunderson, III, positioned himself in the corner of a hallway but refused to approach Chief Shoemaker. (Exhibit A). From that position, Gunderson, III, advised Chief Shoemaker that he had not been driving his truck and had been home all night. (Exhibit A). Chief Shoemaker explained to Gunderson, III, what Chief Shoemaker had observed and that Chief Shoemaker's characterization of Gunderson, III's actions constituted felony alluding. (Exhibit A). Gunderson, III, stated that the truck had been back for two hours, that he had returned home two hours prior to their discussion and that he had not been drinking alcoholic beverages. (Exhibit A).

Gunderson, III, moved quickly around a corner toward the living room as Chief Shoemaker was explaining to Ms. Gunderson that returning tomorrow was not an option. (Exhibit A). Ms. Gunderson noticed Gunderson, III, and his rapid movement into the house, quickly attempting to close the entry door to her

residence. (Exhibit A). Chief Shoemaker called out to Gunderson, III, to return. He did not do so and Ms. Gunderson continued to close the front door. (Exhibit A).

Chief Shoemaker had never been inside the Gunderson residence and was unfamiliar concerning the presence or absence of weapons and the number of exits. (Exhibit A). Chief Shoemaker carefully pushed the door open in a fashion intended to prevent injury to Ms. Gunderson and still permit entrance to the residence to pursue Gunderson, III, to preclude him from escaping or obtaining any weapon. (Exhibit A). Upon entering the dwelling sufficient to observe Gunderson, III, Ms. Gunderson screamed at Chief Shoemaker directing him to leave her house as she stepped into his path in an attempt to block his entry into the dwelling. (Exhibit A). In so doing, Ms. Gunderson raised her arm and struck Chief Shoemaker in the face. Chief Shoemaker was able to squeeze past Ms. Gunderson and was able to see Gunderson, III, standing in the living room/kitchen area of the residence. (Exhibit A). Chief Shoemaker stopped at that point and politely requested the occupants to listen to what he had to stay. (Exhibit A). Ms. Gunderson voiced her assent. (Exhibit A).

Gunderson, II, walked out of the back of the house, voiced his assent as well as his thoughts that he thought the events were really wrong. (Exhibit A). Chief Shoemaker again attempted

to explain that he had the right to pursue a fleeing felony suspect into their residence. (Exhibit A). At this point, the situation began to calm down sufficiently that the occupants were listening to what Chief Shoemaker was saying. (Exhibit A).

Chief Shoemaker then read Gunderon, III, his Miranda warnings pursuant to a Miranda warnings card and Gunderson, III, stated that he understood. (Exhibit A). Gunderson, III, did not say or otherwise indicate that he wanted a lawyer. (Exhibit A). Chief Shoemaker again explained the alluding incident to Gunderson, III. (Exhibit A). Gunderson, III, denied being the driver of the truck, repeatedly stated that his keys were in the ignition of the truck and invited Chief Shoemaker to take a look. (Exhibit A).

Chief Shoemaker smelled alcohol on Gunderson, III's breath and person. (Exhibit A). Gunderson, III's comments concerning the timing of the events did not square with Chief Shoemaker's observations. (Exhibit A).

Gunderson, III, was asked to participate in a horizontal gaze nystagmus test and appeared at first to voluntarily participate. (Exhibit A). Gunderson, III, next paused and asked Chief Shoemaker why Chief Shoemaker was testing him and then started to run to the back of the house. (Exhibit A).

In an effort to stop Gunderson, III, from fleeing, Chief Shoemaker made a slighted but unsuccessful attempt to grab Gunderson, III's arm as he pulled away, yelling that Chief Shoemaker could not touch him. (Exhibit A). Gunderson, III, stopped on his own and returned to the living room where Chief Shoemaker was waiting. (Exhibit A). Chief Shoemaker advised Gunderson, III, that Chief Shoemaker knew that Gunderson, III, was not being truthful with Chief Shoemaker. (Exhibit A). Gunderson, III's response was "If I admit it then I am fucked." Gunderson, III, asked Chief Shoemaker how a person could identify someone at 3:45 a.m., driving in the dark. (Exhibit A). Chief Shoemaker grew tired of the denials from Gunderson, III, and elected to issue a verbal warning to Gunderson, III, for speeding, DUI, felony alluding, and minor in possession of alcohol as well as a warning to Ms. Gunderson for interfering. (Exhibit A). Chief Shoemaker then departed the residence without further incident at approximately 4:42 a.m. after having been at the residence for approximately 21 minutes. (Exhibit A).

II.  Procedural Background.

On June 5, 2006, Plaintiffs initiated this litigation in the Superior Court for the State of Alaska alleging that their Complaint arises out of the unconstitutional and unlawful entry by members of Defendant's Police Department into the Plaintiffs' residence. (Exhibit B). Plaintiffs' claim that the conduct of at

least two members of the City of Sand Point's Police Department violated Plaintiffs' constitutional rights, entitling Plaintiffs to damages. (Exhibit B).

On or about June 29, 2006, Defendant, City of Sand Point, removed this case from the Superior Court for the State of Alaska to U.S. District Court for the District of Alaska as a result of Plaintiffs alleging compromise of their constitutional rights. (Exhibit B).  This case has been properly lodged in the U.S. District Court for more than 30 days with no party making application for remand.

ARGUMENT

I.  Plaintiffs' Complaint, Predicated On Unconstitutional Conduct Of Defendant's Employees Is Not Viable And Should Be Dismissed.

42 U.S.C. §1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.  For the purposes of this section, any Act of Congress

applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

<u>Monell v. Department of Social Services of City of New York</u>, 436 U.S. 658 (1978) clearly provides that the language of §1983 does not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. <u>Monell</u>, at 691. <u>Monell</u> concludes that "a municipality cannot be held liable *solely* because it employees of tortfeasor or, in other words, a municipality cannot be held liable under §1983 on a *respondeat superior* theory." <u>Monell</u>, at 691.

The entirety of Plaintiffs' Complaint is predicated on allegations of unconstitutional behavior on the part of employees of Sand Point, a municipal corporation. No portion of Plaintiffs' Complaint alleges any unconstitutional municipal policy. (Exhibit B). Sand Point should therefor be dismissed.

CONCLUSION

Plaintiffs claim damage at the hands of Sand Point's employees alleging those employees engaged in unconstitutional conduct. The City of Sand Point removed this case to Federal Court because of Plaintiffs' allegations of unconstitutional conduct on the part of Sand Point's employees. However, Plaintiffs' Complaint, styled in such a fashion so as to constitute a claimed breach of 42 U.S.C. §1983, does not state a

viable cause of action against the City of Sand Point. The City of Sand Point therefore respectfully requests this Court grant this request for Summary Judgment, dismissing the entirety of Plaintiffs' Complaint, with prejudice.

Respectfully submitted this 8th of November, 2006 at Anchorage, Alaska.

        s/Michael D. Corey
SANDBERG, WUESTENFELD & COREY
ABA #8511130
701 W. 8th Avenue, Suite 1100
Anchorage, Alaska 99501
Phone: (907) 276-6363
Fax: (907)276-3528
E-Mail: mdc1@aol.com
Attorneys for Defendant

Certificate of Service

I hereby certify that on this 8th day of November, 2006 a copy of the foregoing CITY OF SAND POINT'S MOTION FOR SUMMARY JUDGMENT was served by U.S. Mail on:

David R. Edgren
Edgren Law Offices, LLC
750 East Fireweed, Suite 201
Anchorage, AK  99503


s/Michael D. Corey